## UNITED STATES DISTRICT COURT, NORTHERN DISTRICT OF ILLINOIS

| Name of Assigned Judge or Magistrate Judge | ROBERT W. GETTLEMAN | Sitting Judge if Other Than Assigned Judge | |
|---|---|---|---|
| Case Number | 00 C 1696 | Date | March 9, 2001 |
| Case Title | Vanessa Mbogo | v | USA |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd-party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [use listing in "MOTION" box above]

(2) ☐ Brief in support of motion due _____

(3) ☐ Answer brief to motion due _____ Reply to answer brief due _____

(4) ☐ ☐ Ruling/Hearing on _____ set for _____ at _____

(5) ☐ Status hearing ☐ held ☐ continued to ☐ set for ☐ re-set for _____ at _____

(6) ☐ Pretrial conf. ☐ held ☐ continued to ☐ set for ☐ re-set for _____ at _____

(7) ☐ Trial ☐ Set for ☐ re-set for _____ at _____

(8) ☐ ☐ Bench Trial ☐ Jury Trial ☐ Hearing held and continued to _____ at _____

(9) ☐ This case is dismissed ☐ without ☐ with prejudice and without costs ☐ by agreement ☐ pursuant to ☐ FRCP 4(j) (failure to serve) ☐ General Rule 21 (want of prosecution) ☐ FRCP 41(a)(1) ☐ FRCP 41(a)(2)

(10) ☑ [Other docket entry] **Memorandum opinion and order entered. Accordingly, Plaintiff's motion to reconsider is denied. Defendant's motion to dismiss is granted as to counts I-V. Defendant's alternative motion for summary judgment of count II is granted. This case is terminated.**

(11) ☑ [For further detail see ☐ order on the reverse of ☑ order attached to the original minute order form.]

| | | number of notices |
|---|---|---|
| ☐ | No notices required, advised in open court. | |
| ☐ | No notices required. | |
| ☑ | Notices mailed by judge's staff. | |
| ☐ | Notified counsel by telephone. | date docketed |
| ☐ | Docketing to mail notices. | |
| ☐ | Mail AO 450 form. | docketing dpty. initials |
| ☐ | Copy to judge/magistrate Judge. | date mailed notice |
| | courtroom deputy's Initials | Date/time received in central Clerk's Office | mailing dpty. initials |

MAR 14 2001

Document #

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| VANESSA MBOGO, | ) | |
| | ) | |
| Plaintiff, | ) | No.   00 C 1696 |
| | ) | |
| v. | ) | Judge Robert W. Gettleman |
| | ) | |
| UNITED STATES OF AMERICA, ROBERT | ) | |
| SPRINGER and ALLEN J. NICKELS, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Vanessa Mbogo has filed a five-count complaint against defendants.  In Counts

I, II, and III, plaintiff alleges that the United States of America violated the Americans with

Disabilities Act, 42 U.S.C. §§12101-12213 ("ADA"), the Rehabilitation Act of 1973 ("the

Rehabilitation Act"), 42 U.S.C. §§701-794, and negligently inflicted plaintiff's emotional

distress.[1]  In Counts IV and V, plaintiff alleges that Robert Springer ("Springer") and Allen J.

Nickels ("Nickels") each intentionally inflicted plaintiff's emotional distress.

Two motions are currently before the court.  The first is plaintiff's motion to reconsider

the court's July 31, 2000, Order substituting the United States for Springer and Nickels pursuant

to 28 U.S.C. §2679(d)(2).  The second motion, filed by the government, is essentially three

motions rolled into one.  The first is a motion to dismiss Counts I and II pursuant to Fed. R. Civ.

P. 12(b)(6).  The government also argues for summary judgment pursuant to Fed. R. Civ. P. 56

on Count II.  Finally, the government moves to dismiss Counts IV and V for lack of subject

---

[1] Plaintiff has withdrawn Count III of her complaint since the instant motions were filed.
Accordingly, the court hereby grants the government's motion to dismiss that count by
agreement.

matter jurisdiction.

For the reasons set forth below, plaintiff's motion is denied and the government's motions are granted, terminating the instant case.

## FACTS

In brief, plaintiff alleges that she was injured by Nickels and Springer, who worked with her at the United States Environmental Protection Agency (the "agency"). According to plaintiff, after requesting and receiving permission to take several leaves of absence from the agency due to surgery and a family trip, she was intentionally led to believe that her use of leave time was the subject an agency investigation. Upon learning about this "investigation," and as a result of inquiring about it many times over a period of months but receiving insufficient information as to its findings or outcome, plaintiff alleges that she suffered immediate and ongoing emotional distress, causing her depression.

What follows is a more detailed account of the relevant facts. Throughout the time period covered herein, plaintiff worked as an accountant for the agency, Nickels was an agency Employee Relations Specialist and/or Human Resources Officer, and Springer held the agency position of Assistant Regional Administrator ("ARA") for the Resources Management Division. As ARA, Springer was Division Director to Nickels and plaintiff.

### Plaintiff's Surgery and Ensuing Leave Requests

In January, 1997, plaintiff underwent surgery for infertility. Soon thereafter, plaintiff's doctor provided the agency with a letter stating that she had undergone major gynecologic surgery that January and that he had advised her not to work for a month following the procedure, or until February 23, 1997. On February 18, 1997, plaintiff submitted a form

2

requesting leave from the agency's "Leave Bank" program.[2] The form included medical

information from her doctor detailing plaintiff's "major gynecologic surgery" for "extensive

pelvic adhesions [and] multiple fibroid uterus" and recommending that she not work full-time for

six to eight weeks (roughly covering March and April, 1997). In addition, plaintiff's doctor

indicated on the form that there was no, "likelihood that [plaintiff] will suffer sudden or subtle

incapacitation with" her condition and that there was zero "probability that [plaintiff] will suffer

injury or harm if . . . she were not restricted or accommodated." Dr. David Hinkamp ("Dr.

Hinkamp"), who worked for the agency as the region's Servicing Public Health Physician,

approved plaintiff's request and informed agency Employee Relations Specialist Vitas

Paskuaskas ("Paskuaskas") that plaintiff would be working part-time from January 24, 1997 to

March 14, 1997.

On March 6, 1997, Paskuaskas approved plaintiff as a Leave Bank recipient effective

January 19, 1997, and requested that 80 hours of leave be transferred to plaintiff's Leave Bank

account. The next day, Paskuaskas notified plaintiff, Budelier, and Sheila Barnes ("Barnes"),

plaintiff's timekeeper at the agency, of this information. Barnes immediately informed plaintiff

that 36 hours of advanced sick leave had been given to her as of that date.

In March and April, 1997, plaintiff worked part-time pursuant to her Leave Bank

approval. Then, on April 24, 1997, plaintiff's doctor again submitted a letter stating that he

advised plaintiff to limit her activity and recommending that she work part-time during May as

---

[2] The Leave Bank program gives federal employees the option of donating portions of
their annual leave to a "bank." Leave that is placed in the "bank" may be granted to Leave Bank
donors who, for medical reasons (pertaining either to the employee or a family member), need
leave in excess of their own accumulated sick or annual leave and request leave from the bank.

well. On May 20, 1997, plaintiff sent Arthur Budelier ("Budelier"), acting chief of the agency Program Accounting and Analysis Section, a message to inform him that she did not receive a full paycheck for a prior period, informing him that she had spoken to Paskauskas about the April 24, 1997, letter from her doctor, and asking that he prepare a letter to Paskauskas requesting the additional Leave Bank hours accordingly. Budelier responded to plaintiff's request on May 22, 1997, by sending Paskauskas a memorandum stating that he agrees with her doctor that she needs additional time off from work due to her medical condition and requesting that plaintiff be given an additional 80 hours of Leave Bank time. On May 30, 1997, Paskauskas sent Dr. Hinkamp a letter asking that he review plaintiff's doctor's recent letter. Over a month later, on June 3, 1997, Dr. Hinkamp responded, approving plaintiff's requested 80 hours of additional Leave Bank time.

### Plaintiff's Request for Leave to Take a Family Trip

At the same time plaintiff was requesting and receiving leave time due to her recent surgery, she was also pursuing additional leave time so that she could take a three or four week trip to Kenya in June to visit her mother-in-law, who was seriously ill. Plaintiff initiated this request back in February, 1997, by contacting her immediate supervisor at the agency, Howard Levin ("Levin"). Then, on March 3, 1997, plaintiff sent Levin an electronic message reminding him of her upcoming trip to Kenya. Plaintiff copied that message to Budelier. About five weeks later, on April 22, 1997, plaintiff submitted an application requesting leave without pay for the duration of her June trip. The next day, Budelier approved plaintiff's application. Plaintiff did travel to Kenya in June on approved leave without pay.

## The Agency "Investigation" Into Plaintiff's Leave Requests

On May 9, 1997, the Office of Inspector General ("OIG") sent Springer a memorandum

detailing an anonymous complaint that had been received, stating in part:

> George Mbogo [plaintiff's husband] . . . has been planning a six-week vacation to
> Kenya. Allegedly, his wife, Vanessa Mbogo [plaintiff] . . . requires an operation
> which will require six weeks of recuperation. The complaint [sic] believes that
> Mr. Mbogo's wife does not have [a] valid medical condition. Thus any medical
> documentation submitted for use of Leave Bank would be fictitious . . . . We are
> referring the case to you for action. Please inform us of the actions taken or
> planned by June 4.

On June 5, 1997, defendant Nickels asked an individual at the OIG for a one-day

extension to respond. The next day, defendant Springer sent the OIG a memorandum which

reiterated the request for the one-day extension and explained that he was waiting for a response

"from [Dr. Hinkamp] on plaintiff's latest request for Leave Bank hours." Springer's letter added

that, "[t]he documentation of medical justification appears to be valid for the Leave Bank time

allowed," and that, "this case will be reviewed completely and should any additional information

become available that would indicate possible payroll fraud[,] appropriate action will be taken."

Following this letter, Nickels and Springer waited more than seven months, until January 23,

1997, to give OIG a final response and exonerate plaintiff. During and after these seven months,

plaintiff made many attempts to learn the status of the pending "investigation" into her use of

leave time.

## Plaintiff's Attempts to Learn the Status of the Agency "Investigation"

In July, 1997, plaintiff sent her second-level supervisor, Thomas Haas ("Haas"), a

message questioning why Springer had reviewed her time cards. Haas responded that plaintiff's

"time card file was reviewed as a result of a Headquarters OIG Hotline complaint." Plaintiff also

asked Haas who she should contact regarding the matter, and Haas responded that she should contact Nickels. Thereafter, plaintiff contacted her union and learned that Ron Harris ("Harris") would be her union representative, if needed. Plaintiff then sent five messages to Nickels, each asking to meet with him to discuss the OIG inquiry in the presence of Harris. Receiving no response to the first three messages, plaintiff copied the final two to Springer. Harris also sent a letter to Nickels (which was copied to Springer), accusing Nickels of ignoring plaintiff's requests and asking Nickels to respond.

During this time, plaintiff also contacted Levin, her supervisor, to find out if he had any information about the OIG complaint and ensuing "investigation." Levin responded that he had not heard anything about the matter previously and that he would attempt to find out what was going on. Levin added that he had spoken to Haas that day and that Haas said he didn't know anything about it and that plaintiff should contact Nickels for information.

Since plaintiff and Harris did not receive a response to their requests from Nickels or Springer, Harris contacted Ed Waters ("Waters") of the agency Human Resources Branch, on August 5, 1997. Harris requested that the department respond to plaintiff's requests for a meeting. Waters responded that he would speak to the Human Resources Branch Chief immediately and "work on getting a response." Later that day, Harris went to Nickel's office and, since Nickel's was away, spoke to Waters. Waters assured Harris that he would ask Nickels what was going on and why Nickels had not responded. On August 7, 1997, Harris spoke with Waters again and gave him copies of the messages that had been sent to Nickels. Waters told Harris that Nickels "will probably tell us that the investigation is ongoing for a fact[-]finding issue." Plaintiff (with Harris in the room) called Nickels later that day. During that

6

conversation, Nickels told plaintiff that she was not supposed to know about "this investigation," and that he would discuss the issue with her on August 11, 1997, but he would not meet with her if Harris was present. Harris and plaintiff agree that Nickels spoke aggressively during the conversation; Harris says that Nickels "went ballistic." Later that afternoon, Nickels stopped by to speak to plaintiff's husband, who also works for the agency. Nickels asked plaintiff's husband where plaintiff could be found. In response, plaintiff's husband sent Nickels a message listing plaintiff's department in the agency and her telephone number.

The next day, August 8, 1997, plaintiff sent another message to Nickels acknowledging that he did not want to meet with her and Harris and asking if he would meet with her and her immediate supervisor. That same request was the subject of four more messages plaintiff sent to Nickels on August 14, 15, 18, and 19, 1997. Nickels finally responded on August 19, 1997, agreeing to meet with plaintiff the following day. Plaintiff wrote back immediately indicating that she reserved a conference room for 11:00a.m. the next day and asking whether her immediate supervisor could attend. Nickels did not respond to that message and did not appear for the meeting the following day, prompting plaintiff to send another message to Nickels asking whether he would meet with her. Nickels responded by telling plaintiff that while he was at the agency's Office of Regional Counsel, he discussed the "[O]IG Hotline case I have been tasked with [and] I have been advised that it would be inappropriate for me to meet and discuss this matter with you . . . I will therefore . . . allow the proper [O]IG Office [to] communicate with you if necessary."

Following this exchange, Harris asked the union for help with plaintiff's situation. Louis Sass ("Sass"), President of the American Federation of Government Employees, sent OIG a

Freedom of Information Act ("FOIA") request on August 22, 1997, asking for information on the "investigation" into plaintiff's use of leave time. OIG responded to that request on September 11, 1997, indicating that plaintiff must approve the release of information, which she did via letter on September 16, 1997. By October 27, 1997, plaintiff still had not heard back from the OIG regarding her FOIA request, so she sent another letter to inquire into its status. Yet another inquiry was made by plaintiff with the OIG in early December and the following month plaintiff's husband asked David Ullrich ("Ullrich"), Acting Regional Administrator of the agency, for help concluding the OIG "investigation." Ullrich responded that he was having difficulty getting hold of Springer but that he would continue to try.

Finally, in January, 1998, the OIG responded to the union's and plaintiff's FOIA request. The OIG letter, which was sent to Sass, stated:

> [The OIG] has never conducted, nor are we in the process of conducting, an investigation regarding this matter. Our office received a hotline complaint which was referred to [Springer] . . . . Pursuant to your request, we are forwarding all materials generated by Region which they made available to us . . . . Questions relating to this investigation should be directed to [your region of the agency].

A copy of the OIG response letter was sent to Springer. Then, on January 23, 1998, Paskauskas sent the OIG a message indicating that his office's inquiry found no violation by plaintiff. Thus, on March 5, 1998, plaintiff received final word from OIG that it considered the matter "closed." Even so, plaintiff pursued further information until June 23, 1998, when she received confirmation from Springer that his office's "investigation" was concluded.

Meanwhile, plaintiff began psychological counseling and treatment with Dr. Marie Davidson ("Dr. Davidson") in January 1998 and attended weekly sessions thereafter. Dr. Davidson diagnosed plaintiff as suffering from clinical depression, and plaintiff began taking

8

medication to stabilize her condition. Plaintiff alleges that her psychological condition resulted from the agency's "investigation," harassment and intimidation, its failure to timely provide a final response about plaintiff's case, and its refusal to respond to plaintiff's requests, inquiries and offers to help resolve the matter.

## DISCUSSION

The court will address each motion in turn, beginning with plaintiff's motion to reconsider, and proceeding through each of the government's arguments for termination of the instant case.

### I. Plaintiff's motion to reconsider the court's July 31, 2000 Order substituting the United States as sole defendant

The Federal Tort Claims Act ("FTCA") authorizes suits against the United States "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment." 28 U.S.C. §1346(b). In 1998, the FTCA was amended by the Federal Employees Liability Reform and Tort Compensation Act, Pub. L. No. 100-694, 102 Stat. 4563, more commonly known as the "Westfall Act." The Westfall Act operates to immunize federal employees from liability for tortious acts they commit within the scope of their employment. See Ezekiel v. Michel, 66 F.3d 894, 897 n.5 (7th Cir. 1995).

Accordingly, when claims of tortious conduct by federal employees are made, the Attorney General is empowered by 28 U.S.C. §2679(d)(1) to certify that the employees were acting within the scope of their employment at the time of the incidents out of which the claim arose. This certification operates to substitute the United States for the named parties. 28 U.S.C.

§2679(b)(1). To succeed in reversing that substitution, the plaintiff must show that the federal employee alleged wrongdoers were not acting within the scope of their employment at the time the tortious conduct occurred. Gutierrez de Martinez v. Lamagno, 515 U.S. 417 (1995); Hamrick v. Franklin, 931 F.2d 1209, 1211 (7th Cir. 1991) (finding that, "once the Attorney General [or an appropriate designee] certifies that a defendant employee was acting within the scope of his federal employment, the plaintiff bears the burden of demonstrating otherwise").

The certification in the instant case was effectuated by an Assistant United States Attorney pursuant to 28 C.F.R. §15.3 on July 26, 2000. Consequently, on July 31, 2000, the court entered an Order substituting the United States for Springer and Nickels in Counts IV and V. Plaintiff now asks the court to reconsider that Order, arguing that Springer and Nickels were not acting within the scope of their employment.

Federal courts look to the respondeat superior law in the state where the conduct is alleged to occur, in this case Illinois, to determine whether federal employees' actions are within the scope of their employment. See Duffy v. United States, 966 F.2d 307, 314 (7th Cir. 1992). Under Illinois law, the conduct of a servant is within the scope of employment if, but only if: (1) it is of the kind he is employed to perform; (2) it occurs substantially within the authorized time and space limits; and (3) it is actuated, at least in part, by a purpose to serve the master. Id. Thus, in order to succeed in her motion, plaintiff must show that the actions of Springer and Nickels were different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the agency. Id. (citing Pyne v. Witmer, 543 N.E.2d 1304, 1308 (Ill. 1989)). Plaintiff has failed to establish any one of these points.

According to plaintiff, Springer and Nickels caused her severe emotional distress by

intentionally misrepresenting that an investigation was pending against her, and by refusing to timely provide her with information regarding that investigation. Accepting plaintiff's allegations as true, plaintiff still has not shown that Springer's and Nickels' actions were outside the scope of their employment with the agency. Plaintiff attempts to argue, based on Swider v. Yuetter, 1991 U.S. Dist. LEXIS 7733, *6 (Report and Recommendation of then-Magistrate Judge Ronald A. Guzman dated February 27, 1991) that "[defendants'] awareness of [plaintiff's] emotional susceptibility is a serious consideration and that abuse of power 'aggravates the outrageousness of the conduct.'" Plaintiff's reliance on Swider, however, is misguided; Swider is neither binding nor relevant because it addresses a claim of intentional infliction of emotional distress (only) and not a determination of whether the defendant was acting within the scope of his employment.

Instead, the court agrees with the government that the substitution was proper because Springer and Nickels were acting within the scope of their employment throughout the time-frame relevant to the instant case. Springer and Nickels were employees of the agency throughout the period during which plaintiff claims they intentionally caused her emotional distress. Also, their initial involvement in the examination of plaintiff's use of Leave Bank time was part of their official job responsibilities for the agency; by plaintiff's own account, the "IG Hotline Case" was "referred" to Springer by the OIG, and Nickels, as Springer's subordinate, was "tasked with" looking into the complaint made regarding plaintiff. cf. Bartoli v. Attorney Registration & Disciplinary Comm'n, 1998 U.S. Dist. LEXIS 14096, *9, 1998 WL 596694, *3 (N.D. Ill. 1998) (finding that an IRS agent's investigation of taxpayer complaints about illegal activity and reassessment of tax liability "are the kinds of acts that IRS agents are employed to

11

perform").

Additionally, all of the actions taken by Springer and Nickels about which plaintiff complains occurred on agency premises, during regular business hours, using agency communications devices. See Taboas v. Mlynczak, 149 F.3d 576, 582 (7th Cir. 1998) (stating that conduct which occurred "primarily during the hours and within the place of employment" is within the scope of the employees' employment).

Further, as defendant points out, the issue of plaintiff's use of leave time is a matter inherently related to official agency business; the whole point of the OIG inquiry was to assure that plaintiff, as an agency employee, legitimately requested and received time credit from the agency Leave Bank. cf. Bartoli, 1998 U.S. Dist. LEXIS at *8 (noting that the actions of an IRS agent, which were aimed at stamping out activity that "is considered a threat to . . . the IRS," were in the interest of his employer and therefore supported the assertion that they were within the scope of his employment). Finally, Nickels' act of informing plaintiff that he had been advised by the agency Office of Regional Counsel that, "it would be inappropriate for me to meet and discuss this matter with you," is a clear indication that his conduct was based at least partly on a desire to further the agency's interests.

Under Illinois law, an employer may be liable for the negligent, wilful, malicious, or even criminal acts of its employees when such acts are committed in the scope of an employee's employment. Cleary v. U.S. Marshal's Serv., 1998 U.S. Dist. LEXIS 7283, *21, 1998 WL 246445, *6 (N.D.Ill. 1998). Thus, even if it is true that Springer and Nickels intentionally inflicted plaintiff's emotional distress, the record is clear that they did so while performing duties delegated to them by the agency, during business hours and on agency property, and that their

12

actions were motivated, at least in part, by a purpose to serve the agency. cf. Coleman v. Smith, 814 F.2d 1142, 1150-51 (7th Cir. 1987) (applying Illinois law and finding that police officers who "usurped" and "misused" their power in conducting a false arrest nevertheless acted within the scope of their employment); Randi F. v. High Ridge YMCA, 524 N.E.2d 966, 970 (Ill. Ct. App. 1988) ("If an employee commits an intentional tort with the dual purpose of furthering the employer's interest and venting personal anger, respondeat superior may lie; however, if the employee acts purely in his own interest, liability under respondeat superior is inappropriate."); Taboas, 149 F.3d at 582 n. 6. Thus, plaintiff's motion to reconsider the court's substitution of the United States for Springer and Nickels is denied.

## II. The government's motion to dismiss Counts I and II (under the ADA and the Rehabilitation Act)

### A. Legal Standard

In ruling on motions to dismiss for failure to state a claim, the court considers "whether relief is possible under any set of facts that could be established consistent with the allegations." Bartholet v. Reishauer A.G., 953 F.2d 1073, 1078 (7th Cir. 1992). Claims may be dismissed only if it is beyond doubt that under no set of facts would the plaintiff's allegations entitle him to relief. See Travel All Over the World, 73 F.3d at 1429-30. The purpose of a motion to dismiss is to test the sufficiency of the complaint, not to decide its merits. See Gibson v. City of Chicago, 910 F.2d 1510, 1520 (7th Cir. 1990).

### B. Discussion

In its motion, the government argues that Count I of the complaint should be dismissed because plaintiff, a federal employee, cannot sue under the ADA. The government is correct.

The United States is exempted from coverage by the ADA pursuant to the definition of an "employer" under that Act. See 42 U.S.C. §12111(5)(B) (stating that, "the term "employer" does not include–(i) the United States"); Rivera v. Heyman, 157 F.3d 101, 103 (2d Cir. 1998) (citing §12111(5)(B) and stating, "[a]s a federal employee, [the plaintiff] has no remedy for employment discrimination under the ADA."). Thus, Count I is dismissed.

Next the government argues that Count II (under the Rehabilitation Act) should be dismissed because plaintiff named the United States, rather than Carol M. Browner, the Administrator of the Environmental Protection Agency, in her Rehabilitation Act claim. The government is correct again. "[T]he exclusive remedy for a claim that a federal agency discriminated against a [disabled] employee . . . is a suit against the agency's head." McGuinness v. United States Postal Service, 744 F.2d 1318, 1322-23 (7th Cir. 1984); see also Hamm v. Runyon, 51 F.3d 721, 722 n.1 (7th Cir. 1995). Recognizing her error, plaintiff says in her reply brief that she, "will be happy to personally name Carol M. Browner in an [a]mended [c]omplaint." Count II is therefore dismissed..

## III. The government's alternative motion for summary judgment of Count II

Assuming plaintiff will file a proper amended complaint under the Rehabilitation Act naming Carol M. Browner, the government urges the court to grant summary judgment in its favor on Count II notwithstanding plaintiff's error.

### A. Legal Standard

A movant is entitled to summary judgment under Rule 56 when the moving papers and affidavits show there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986);

Unterreiner v. Volkswagen of America, Inc., 8 F.3d 1206, 1209 (7th Cir. 1993). When ruling on a motion for summary judgment, the court considers the record as a whole and draws all reasonable inferences in the light most favorable to the party opposing the motion. See Fisher v. Transco Services-Milwaukee, Inc., 979 F.2d 1239, 1242 (7th Cir. 1992).

In the instant case, the government has invited the court to assume the truth of the factual allegations made in plaintiff's complaint. Thus, the court need only determine whether, based on those facts, the government is entitled to judgment as a matter of law. Quality Auto Body, Inc. v. Allstate Ins. Co., 660 F.2d 1195, 1199 (7th Cir. 1981). To oppose the government's motion, plaintiff must do more than show the "mere existence of a scintilla of evidence" in support of her position; she must produce evidence on which a jury could reasonably find for" her. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). Plaintiff "will be successful in opposing summary judgment only [if she presents] definite, competent evidence to rebut the motion." Smith v. Severn, 129 F.3d 419, 427 (7th Cir. 1997) (citations and internal quotation marks omitted).

### B. Discussion

The Rehabilitation Act provides that no "qualified individual with a disability . . . shall, solely by reason of her or his disability, be . . . subjected to discrimination." 29 U.S.C. §794(a). It is appropriate to apply ADA standards to determine whether a violation of this section has occurred. 29 U.S.C. §794(d); Vande Zande v. Wisconsin Dep't of Admin., 44 F.3d 538, 542 (7th Cir. 1995). Under the ADA, a person is a qualified individual with a disability if he or she has "a physical or mental impairment which substantially limits one or more of [their] major life activities." 42 U.S.C. §12102(2)(A). Further, the ADA defines "discrimination," in part, as "not

making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C. §12112(b)(5)(A). According to the Seventh Circuit, an "accommodation" is a change in an employer's "ordinary work rules, facilities, terms, and conditions" that "enable[s] a disabled individual to work." Vande Zande, 44 F.3d at 542.

Plaintiff correctly asserts that her infertility is a disability under the ADA. Pacourek v. Inland Steel Co., 858 F. Supp. 1393, 1404-05 (N. D. Ill. 1994) (finding that infertility is a physical impairment that substantially limits the major life activity of reproduction under the ADA). The government argues, however, that even if that is true, based on the facts alleged in her complaint and the exhibits attached thereto, plaintiff cannot show that she was denied "a single accommodation that she requested due to her condition." Plaintiff counters by pointing to what she calls her "twenty-four accommodation requests [that agency officials] ignored, denied, or refused to respond to."

There is a problem with plaintiff's argument, however; the twenty-four "accommodation requests" to which plaintiff refers were actually her inquiries within the agency to learn the status of what she thought was an investigation into her use of Leave Bank time. Contrary to plaintiff's assertion, there is no indication that her inquiries to Springer and Nickels were in any way motivated by her infertility.[3] Likewise, at no time did plaintiff assert that their failure to respond

---

[3] Perhaps plaintiff is referring to the possible *remote* connection that plaintiff's disability prompted her to request leave time and that, in turn, those requests prompted what she thought was an investigation into her use of leave time, which, in turn, prompted her to *believe* that she was being treated differently because of her infertility. As attenuated as that possibility is, it is compounded further by the fact that the impetus for Springer's and Nickel's examination of plaintiff's use of leave time was actually an *anonymous* complaint made to the OIG—a complaint made by someone who obviously did not realize that plaintiff's surgery and her trip to Kenya were separated by six months' time and completely unrelated.

to her inquiries was in some way interacting with her disability and impeding her from working or, vice versa, that their response would have enabled her to perform her job despite her disability. It might be true that Springer and Nickels did a poor job of looking into plaintiff's use of leave time,[4] but plaintiff has presented no evidence to support her assertion that their alleged ineptitude and impertinence were in response to any request that they accommodate her disability. In fact, plaintiff has failed to establish that Nickels and Springer *were aware* of her infertility. As explained, under the Rehabilitation Act, plaintiff must show that she was discriminated against *solely by reason of her disability*. 29 U.S.C. §794(a). "Self-serving assertions without factual support in the record will not defeat a motion for summary judgment." Jones v. Merchants Nat'l Bank & Trust Co., 42 F.3d 1054, 1057 (7th Cir. 1994) (quoting McDonnell v. Cournia, 990 F.2d 963, 969 (7th Cir. 1993)). Accordingly, the court finds that no reasonable trier of fact could conclude that plaintiff's twenty-four attempts to find out about the OIG-prompted examination of her use of Leave Bank time were accommodation requests relating to her disability.

Consequently, the facts establish that plaintiff never requested an accommodation for her disability. As the Seventh Circuit recently noted in Jovanovic v. In-Sink-Erator, 201 F.3d 894, 899 (7th Cir. 2000), "the standard rule is that a plaintiff must normally request an accommodation before liability under the ADA attaches."[5] Id. (citing Mole v. Buckhorn Rubber

---

[4] Then again it might not, at least with respect to their refusal to provide plaintiff with the information she requested prior to her seeking to obtain it through the FOIA; the agency posits that doing so would have violated the Privacy Act pursuant to 5 U.S.C. §552a(b).

[5] The Jovanovic court recognized one clear exception to this rule, but that exception does not apply to plaintiff. See id. (discussing Bultemeyer v. Fort Wayne Community Sch., 100 F.3d

Products, Inc., 165 F.3d 1212, 1218 (8th Cir.), cert. denied, 120 S. Ct. 65 (1999), for the

proposition that '[o]nly [the employee] could accurately identify the need for accommodations

specific to her job and workplace") (further citation omitted). As the Jovanovic noted:

> [T]he ADA does not require an employer to assume that an employee with a
> disability suffers from a limitation. In fact, better public policy dictates the
> opposite presumption: that disabled employees are not limited in their abilities to
> adequately perform their jobs. . . . Accordingly, it is incumbent upon the ADA
> plaintiff to assert not only a disability, but also any limitation resulting therefrom.

Id. (quoting Taylor v. Principal Fin. Group, Inc., 93 F.3d 155, 164-65 (5th Cir. 1996).

If *any* requests plaintiff made in the instant case could be couched in terms of requests for

a disability accommodation, it is her requests for leave following her surgery. Each of those

requests were granted by the agency, however, making them inherently reasonable

accommodations. See Feliberty v. Kemper Corp., 98 F.3d 274, 280 (7th Cir. 1996)

("Determining whether an accommodation is reasonable depends, to a significant extent, upon

determining whether the employer has acceded to the disabled employee's request."). Hence, the

court finds that the agency did engage in an interactive process with plaintiff and did give her the

accommodation that enabled her to continue working. 29 C.F.R. §1630.2(o)(3); Hendricks-

Robinson v. Excel Corp., 154 F.3d 685, 693 (7th Cir. 1998)). Plaintiff has no "failure to

accommodate" claim under the Rehabilitation Act.

Plaintiff has another theory of the agency's liability; she claims that the actions taken by

the agency created a "hostile work environment" and that this claim is cognizable under the

---

1281, 1285 (7th Cir. 1996), in which the Seventh Circuit stated that when an employee has
mental disabilities, making the communication process more difficult, the employer must meet
the employee halfway--if the employee needs an accommodation but is unable to ask for one, the
employer should do what it can to help).

Rehabilitation Act. Plaintiff bases that assertion on <u>Silk v. City of Chicago</u>, 194 F3d 788 (7th Cir. 1999). In <u>Silk</u>, the Seventh Circuit assumed (without holding) that "such a claim 'would seem to arise under the general prohibition against discrimination with respect to terms or conditions of employment contained in [42 U.S.C.] §12112(a)' and in 29 C.F.R. §1630.4, which provides that it is unlawful to discriminate against a disabled employee in regard to any 'term, condition, or privilege of employment.'" <u>Id</u>. at 803 (quoting <u>Miranda v. Wisconsin Power & Light Co.</u>, 91 F.3d 1011, 1017 (7th Cir. 1996). The court will thus follow suit with <u>Silk</u> and consider whether plaintiff can make out a hostile work environment claim using the traditional Title VII analysis.

To survive summary judgment on this claim, plaintiff must show that her work environment was both subjectively and objectively hostile. <u>Swiech v. Gottlieb Mem. Hosp.</u>, 2000 U.S. Dist. LEXIS 5854, *17-18, 2000 WL 343244, *14-15 (N.D. Ill. 2000) (citing <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 21 (1993)). The relevant factors for the court to consider include the frequency and severity of the conduct, whether it was humiliating or physically threatening (as opposed to a mere offensive utterance), and whether it unreasonably interfered with plaintiff's work performance. <u>See id</u>. In addition, the harassment must be "so severe or pervasive as to have altered the conditions of plaintiff's employment and have created an abusive working environment." <u>Swich</u>, 2000 U.S. Dist. LEXIS at *18, 2000 WL 353244 at *15 (citing <u>Meritor Sav. Bank, FSB v. Vinson</u>, 477 U.S. 57, 67 (1986)).

The court will not belabor this point. Plaintiff does not come close to establishing that she was subjected to an objectively hostile work environment on account of the actions of Springer and Nickels. Not only were their actions not frequent, not severe, not humiliating and

19

not physically threatening, but nothing in the record indicates that their conduct interfered with plaintiff's work performance. The bulk of plaintiff's claim rests on the fact that Springer and Nickels *ignored* her for months, taking no action at all; the failure of coworkers to act does not constitute grounds for a claim of a hostile work environment. There is perhaps one incident that enters the hostile work environment ballpark: when Nickels "went ballistic" while talking to plaintiff on August 7, 1997. Even that incident cannot be said to be "severe" or "physically threatening," however, since it was a telephone conversation and was not followed by any direct contact between plaintiff and Nickels. Moreover, there is no evidence that the conditions of plaintiff's employment were altered in any way throughout the course of events relevant to the instant action; she was not fired, not demoted, not passed up for a promotion, not transferred, her job responsibilities were not altered, and her salary was not lowered.

Based on all this, the court finds that no reasonable jury could conclude that the agency was an abusive work environment for plaintiff. Plaintiff may very well have subjectively perceived the agency's environment to be hostile and sought treatment for clinical depression on that basis, but it is well established that not everything that makes an employee unhappy is an actionable adverse action. See Conley v. Village of Bedford Park, 215 F.3d 703, 712 (7th Cir. Ill. 2000) (citing Smart v. Ball State Univ., 89 F.3d 437, 441 (7th Cir. 1996)).

In conclusion, the court grants the government's motion to dismiss Count II of plaintiff's complaint. In addition, the court further finds that even if plaintiff were to amend the count to name the Administrator of the Environmental Protection Agency, the government would still be entitled to judgment as a matter of law. Hence, the government's motion for summary judgment of Count II is granted.

20

## IV. The government's motion to dismiss Counts IV and V (intentional infliction of emotional distress)

As discussed in Section I, supra, the court has found that Springer and Nickels were acting within the scope of their employment at all times relevant to the instant case. Thus, plaintiff's only remedy for Counts IV and V is under the Federal Employees' Compensation Act, 5 U.S.C. §8101 *et seq*., which requires plaintiff to bring her emotional distress claims before the Secretary of Labor, rather than a federal court. See 5 U.S.C. §§8128(b), 8145; Ezekiel v. Michel, 66 F.3d 894, 898 (7th Cir. 1995); Trammel v. Brown, 1995 U.S. Dist. LEXIS 17793, *14-15, 1995 WL 708666, *4 (N.D. Ill. 1995). As a result, the court grants the government's motion to dismiss Counts IV and V for lack of subject matter jurisdiction.

## CONCLUSION

Plaintiff's motion to reconsider is denied. The government's motion to dismiss is granted as to Counts I-V. Finally, the government's alternative motion for summary judgment of Count II is granted. This case is terminated.

**ENTER:** **March 9, 2001**

Robert W. Gettleman
United States District Judge

21